**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JASON B.,

          Plaintiff,

   v.

ANDREW M. SAUL,
Commissioner of Social Security,

          Defendant.

Case No. 18 C 1627

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Jason B.[1] seeks reversal of the final decision of the Commissioner of Social Security, determining that he experienced medical improvement and that his disability ended on July 13, 2009. The Commissioner asks the Court to uphold the ALJ's decision. Because substantial evidence does not support the ALJ's mental RFC determination after the closed period of disability, the Court reverses the ALJ's decision on this ground and grants in part and denies in part Plaintiff's Motion for Summary Judgment [20].

## BACKGROUND

Jason applied for disability insurance benefits alleging that he had become disabled on November 5, 2007, following an on-the-job back injury that resulted in a three-level spinal fusion surgery. He alleged disability based on lower back injury with failed back fusion, depression, and memory problems. At the time of the alleged disability onset date, Jason was 32 years old and had previously worked as a heavy delivery truck driver. His application was denied initially and on reconsideration. (R. 66-67, 73-8, 82). Following a hearing at which a vocational expert ("VE")

---

[1]     In accordance with Internal Operating Procedure 22, the Court refers to Plaintiff as "Jason B." or "Jason."

testified, the ALJ issued a decision concluding that Jason had the residual functional capacity ("RFC") to perform a range of light work, and ultimately finding that Jason was not disabled. *Id*. at 24-41, 42-65. After the Appeals Council declined to review the ALJ's decision, Jason sought judicial review of the agency's decision. *Id*. at 9-14.

On May 5, 2014, Magistrate Judge Jeffrey Cole reversed and remanded the case to the Commissioner for further proceedings, finding that the ALJ erred in relying on the state agency physician's report. (R. 1241-47). On September 2, 2014, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ "for further proceedings consistent with the order of the court." *Id*. at 1257. The Appeals Council instructed the ALJ to "offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." *Id*. at 1258.[2] On March 25, 2015, the same ALJ held a second hearing. (R. 1172-1215). Jason, represented by counsel, testified at this hearing in addition to Dr. Michael Cremerius, a psychological expert, Dr. Ashok Jilhewar, a physician medical expert (ME), and Cheryl Hoiseth, a vocational expert (VE). *Id*.

On July 31, 2015, the ALJ issued a partially favorable decision. (R. 1144-63). She first applied the required five-step evaluation process. 20 C.F.R. 404.1520(a)(4). At step three, she concluded that from November 5, 2007 through July 13, 2009, the severity of Jason's degenerative disc disease medically equaled the criteria of Listing 1.04A. (R. 1149-50). Next, applying the eight-step process for assessing medical improvement, the ALJ determined that Jason could work beginning July 14, 2009.[3] *See* 20 C.F.R. § 404.1594(f). First, she found that Jason had not engaged

---

[2]    Jason filed a second application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in December 2013. (R. 1424-32). The Appeals Council directed the ALJ to consolidate all of Jason's claim files on remand. *Id*. at 1257.

[3]    For an SSI claim, the performance of substantial gainful activity is not a factor used to determine if the claimant's disability continues, and the analysis starts with step two. 20 C.F.R. § 416.994(b)(5). Steps

in substantial gainful activity since his alleged onset date of November 5, 2007 (step one). *Id*. at 1149. She next determined that as of July 14, 2009, Jason had the impairments of depression, anxiety, substance abuse disorder, degenerative disc disease, status post L3-S1 spinal fusion surgery, morbid obesity, and obstructive sleep apnea. *Id*. at 1149-50. However, the ALJ found that beginning July 14, 2009, Jason did not have an impairment or combination of impairments which met or medically equaled the severity of a listed impairment, even considering the impact of his morbid obesity (step two). *Id*. at 1150-52. Addressing Listing 1.04, the ALJ noted that Jason has no neurologic deficit, his pain is neuroanatomic in distribution, his straight-leg raising test is negative, he has no motor or sensory deficit, he does not ambulate with an assistive device, and he has not been found incapable of ambulating effectively. *Id*. at 1150-51. The ALJ then considered the severity of Jason's mental impairments. *Id*. at 1151-52. Applying the Paragraph B criteria, the ALJ found that Jason had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and one to two episodes of decompensation, each of extended duration. *Id*. at 1151. The ALJ concluded that the Paragraph B criteria were not satisfied because his mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. *Id*.

The ALJ then determined that medical improvement occurred as of July 14, 2009, which was related to Jason's ability to work (steps three and four). *Id*. at 1152. Specifically, the ALJ concluded that Jason was found capable of performing light to medium work for up to five hours a day, his activities increased, his use of pain medication decreased at this time and thereafter, and

---

two through eight of a DIB claim evaluation process are identical to the seven-step process used to evaluate an SSI claim. 20 C.F.R. §§ 404.1594(f), 416.994(b). For convenience, the Court will only cite to the DIB regulations.

that he no longer had an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *Id*. The ALJ then found that Jason's impairments of depression, anxiety, substance abuse disorder, degenerative disc disease, status post L3-S1 spinal fusion surgery, morbid obesity, and obstructive sleep apnea are severe (step six).[4] *Id*. at 1149-50. She deemed Jason's hypertension non-severe as of July 14, 2009. *Id*. The ALJ next assessed Jason's RFC, finding he could perform sedentary work except that he can: occasionally climb ramps and stairs but never ladders, ropes or scaffolds; occasionally balance and stoop but never kneel, crouch, or crawl; never tolerate exposure to, or work around hazards such as moving machinery or unprotected heights and cannot be exposed to vibration; perform unskilled work tasks learned by demonstration or in 30 days or less of simple, repetitive and routine nature but is also limited to occasional, superficial, and incidental contact with the general public and occasional interaction with supervisors and coworkers. *Id*. at 1152.[5] Finally, the ALJ found that Jason was unable to perform his past relevant work as a heavy delivery truck driver since July 14, 2009, but could perform a significant number of jobs in the national economy, including hand packer and officer clerk/document preparer. *Id*. at 1161-62. Therefore, the ALJ fund that Jason was not disabled and that his disability ended as of July 14, 2009. *Id*. at 1162.

## DISCUSSION

The Court reviews the ALJ's decision to determine whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*,

---

[4]     The ALJ properly skipped step five which was not relevant because the ALJ found that Jason had experienced medical improvement related to his ability to work. *See* 20 C.F.R. § 404.1594(f)(4).

[5]     "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing an ALJ's decision, the Court may "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

At step eight of the continuing disability analysis, the ALJ found Jason not disabled because he retains the RFC to perform other work that exists in significant numbers in the national economy. Jason argues that the ALJ erred by: (1) failing to determine that his chronic pain syndrome was a severe impairment; (2) misrepresenting the record; (3) failing to properly assess his treating orthopedic surgeon's opinion; (4) failing to properly account for his temperamental deficiencies and moderate limitations in concentration, persistence, or pace in the RFC; and (5) failing to include a 45-minute sitting and standing limitation into the hypothetical posed to the VE. Jason's fourth challenge merits reversal in this case.

## A.    Chronic Pain Syndrome

Jason's first contention that the ALJ erred in failing to find that his chronic pain syndrome was a severe impairment is easily disposed of as the ALJ categorized numerous other impairments as severe and proceed to the next step in the sequential process.  Severe impairments are evaluated at both step two of the five-step sequential disability evaluation process and step six of the eight-step continuing disability evaluation process.  *See* 20 C.F.R. §§ 404.1520(c), 1594(f)(6).  "Impairments are not 'severe' when they do significantly limit the claimant's ability to perform basic work activities, including 'walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.'" *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016); 20 C.F.R. § 404.1520(c).  At step six of a medical improvement DIB case such as this one, the ALJ must "consider all [claimant's] current impairments and the impact of the combination of those impairments on [his] ability to function." *Id.*[6]  "When the evidence shows that all [claimant's] current impairments in combination do not significantly limit [his] physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature" and "he will no longer be considered to be disabled." *Id.*  If the residual functional capacity assessment in step four shows significant limitation of claimant's ability to do basic work activities, the ALJ proceeds to step seven where the ALJ determines whether the claimant can perform his past relevant work. *Id.*  The ALJ then assesses a claimant's RFC at step seven "based on all [his] current impairments." 20 C.F.R. § 404.1594(f)(7).  Like step two of the five-step sequential evaluation process, step six of the medical improvement analysis is a threshold inquiry.  "As long as the ALJ determines that

---

[6]    At step two of the five-step sequential evaluation process, the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe . . . ." 20 C.F.R. § 404.1520(a)(4)(ii).

the claimant has one severe impairment the ALJ will proceed to the remaining steps of the evaluative process." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010).

At step six, the ALJ determined that Jason had not developed any new impairment since July 14, 2009 and that his current severe impairments were the same as those present from November 5, 2007 through July 13, 2009. (R. 1150). Thus, the ALJ's analysis did not end at step six. Because the ALJ resolved step six in Jason's favor and proceeded through step eight of the continuing disability process, any error in that determination was not harmful. *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019) ("Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless."); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("[E]ven if there was a mistake at Step 2 [of the five-step sequential disability evaluation process], it does not matter. Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluative process as long as there exists even *one* severe impairment.").

Moreover, after determining that Jason's current impairments in combination were severe, the ALJ determined that he had the RFC to perform a range of sedentary work with certain postural, environmental, and mental limitations. (R. 1152). In determining Jason's RFC, the ALJ expressly considered Jason's continued complaints of pain, Dr. Koehn's assessment of improvement in terms of chronic pain syndrome, Dr. Koehn's referral to Dr. Gregory Hawley for a formal psychiatric evaluation, and Dr. Hawley's diagnosis of chronic pain disorder when crafting an RFC and incorporated into the RFC limitations related to pain. *Ray*, 915 F.3d at 492 ("Either way, the ALJ must later consider the limitations imposed by all impairments, severe or non-severe."); *see* (R. 1153) (noting Jason "still goes to the pain management doctor" and Dr. Jilhewar testified that he was aware of Jason's "continued reports of unresolved pain" after the closed period."); (R. 1154)

(noting Functional Capacity Assessment (FCA) limitations dated 6/11/2009 "expressly include consideration of pain"); (R. 1156) (noting at 10/25/2010 visit with Dr. Koehn Jason "showed some improvement, particularly in terms of chronic pain syndrome behavior and at November 2010 visit Jason "reported no increase in pain with the tapering of medications" and "[t]apering of medication was to continue"); (R. 1157) (giving "considerable weight" to state agency mental consultants' opinions but finding "a greater degree of limitation in social functioning on the residual functional capacity to reflect irritability resulting from perceived pain."); (R. 1158) (noting referral to Dr. Hawley for psychiatric evaluation and diagnosis of chronic pain disorder); (R. 1160, 1161) (considering Jason's obesity and pain when fashioning the postural and environmental limitations of the RFC). Therefore, the Court does not find any error beyond step six because the ALJ addressed the impact of Jason's continued complaints of pain in formulating the RFC.

**B.      Alleged Misrepresentations of the Record**

Next, Jason argues that the ALJ improperly misrepresented the record in two respects. First, Jason contends that the ALJ misrepresented that his fusion surgery "itself went well." (R. 1160). Second, Jason contends that the ALJ misrepresented that ME Dr. Jilhewar's opinion was uncontroverted. Jason's arguments are not well taken.

Jason first submits that the ALJ misrepresented that his "fusion surgery itself went well" because Dr. Koehn concluded the surgery was "considered a failed fusion" which would require medical management and low level physical activity. (R. 775, 1160). Jason also points to records from a Psychosocial Assessment on November 26, 2013 which indicate that Jason's depressive disorder and anxiety disorder symptoms led to social withdrawal and isolation and limited his desire to do things he once enjoyed and a September 22, 2009 ER visit for observation and

treatment of suicidal ideations and major depressive disorder with associated alcohol intoxication and a desire to "end it all." *Id*. at 1083. 1500.

The evidence Jason relies on does not establish that the ALJ erred in stating that the "fusion surgery itself went well." (R. 1160). First, the ALJ made this statement in her discussion of Jason's subjective statements, which she found not entirely credible, a determination that Jason does not challenge. Second, it appears that the ALJ was referring to the surgery "itself" going well, rather than finding that Jason had an excellent outcome from his surgery, such that he returned to his pre-injury functioning or was pain free after undergoing lower back surgery—as Jason seems to suggest. In the context of the entire decision, the Court reads the ALJ's statement to mean that there were no complications or problems associated with the actual surgery or recovery form the surgery. The ALJ's statement that Jason's triple fusion surgery "itself went well" is substantially supported. (R. 861) (12/15/08 – noting "[t]he x-ray demonstrates good position of the hardware. The wound looks excellent. Neurologically he is totally intact."); (R. 862) (1/19/09 – stating "[o]n examination his incision is well healed" and x-rays "show pedicle screws at L3, L4, L5 and S1 with posterolateral fusions forming."); (R. 863, 864) (3/2/09 and 4/13/09 - noting "incision is well healed" and x-rays "show pedicle screws at L3, L4, L5, and S1 with a generous posterolateral fusion."); (R. 865) (6/30/09 – noting x-rays "show pedicle screws at L3, L4-5, and S1 with posterolateral and interbody fusion formed nicely."); (R. 867) (1/4/10 – stating x-rays "show pedicle screws at L3, L4, L5, and S1 with a good posterolateral fusion forming nicely. It is a mature fusion."). As the ALJ noted at step three, Jason's recovery from surgery "was uneventful" and despite continued complaints of pain, he has "no ongoing neurological abnormalities and the fusion had healed." *Id*. at 1150. Although Dr. Koehn characterized the surgery as a "failed fusion," Jason's orthopedic surgeon, Dr. Lorenz, did not indicate that the surgery was a failure. *Id*. at 1155.

Moreover, the record reflects that Jason did improve after the surgery compared to his pre-surgery condition, but the ALJ recognized that Jason had pain symptoms post-surgery. (R. 1160) (recognizing that Jason "continued to complain of pain."); (R. 1153, 1160) (giving great weight to Dr. Jilhewar's opinion who recognized that Jason had continued reports of unresolved pain after 7/13/09); (R. 1155) (giving some weight to the 6/11/09 FCA because it "incorporate[d] a consideration of pain."); (R. 1160) (accommodating Jason's obesity and pain by including postural and environmental limitations to the RFC). The ALJ also correctly noted that Jason's functional capacity improved from a light to a light to medium exertional capacity after the surgery. *Id.* 627-36, 680-88, 1154.

Jason next argues that the ALJ misrepresented that Dr. Jilhewar's opinion was "uncontroverted." (R. 1150). He contends that this is incorrect because Dr. Lorenz and the FCA dated June 11, 2009 limited Jason to a 5-6 hour workday, pain specialist Dr. Koehn stated on July 20, 2009 that Jason's multilevel fusion failed, and Dr. Koehn noted on March 15, 2010 that Jason's "[d]aily life tasks are markedly limited, back pain, standing to do dishes, lifting, other" *Id*. at 629, 775, 866, 959.

The Court acknowledges that after finding at step three that Jason's impairments medically equaled listing 1.04A during the time period from November 5, 2007 through July 13, 2009, the ALJ stated that "[a]s for the opinion evidence, as discussed below, I give great weight to the well-supported and uncontroverted opinion of Dr. Jilhewar." (R. 1150). The ALJ likely meant to indicate that Dr. Jilhewar's assessment was uncontroverted as to the period between November 5, 2007 through July 13, 2009. This is true because there is no other medical opinion as to Jason's functional limitations during that period prior to July 14, 2009 other than the medical opinion of state agency physician Dr. Gonzalez (and by extension, state agency physician Dr. Calixto Aquino

on reconsideration) which Judge Cole found was flawed. *Id.* at 944-45, 984-91, 1245. When read in context and considering the ALJ's statements in the decision as a whole, the ALJ's statement cannot reasonably be read as indicating that the ALJ believed Dr. Jilhewar's opinion as to Jason's RFC beginning July 14, 2009 was uncontroverted.

The ALJ's analysis and subsequent RFC determination regarding the period after July 13, 2009 make clear that the ALJ recognized the inconsistencies between Dr. Jilhewar's opinion and other evidence, including Dr. Lorenz's opinion. First, the ALJ expressly accepted Dr. Jilhewar's opinion that Jason equaled Listing 1.04A between November 5, 2007 and July 13, 2009. (R. 1150, 1192). The challenged statement regarding Dr. Jilhewar's opinion being uncontroverted was made during her step three assessment of Jason's impairments during the period from November 5, 2007 through July 13, 2009. (R. 1150). Considered in context, it is most likely that the ALJ's statement was a reference to Dr. Jilhewar's opinion during the period prior to July 14, 2009.

Second, after the challenged statement, the ALJ explicitly discussed not just Dr. Jilhewar's opinion, but also most of the evidence which Jason asserts controverts Dr. Jilhewar's opinion that he can perform full-time work beginning July 14, 2009. (Doc. 21 at 19). For example, the ALJ considered the June 11, 2009 FCA which limited Jason to a performing a 5 to 6 hour workday at the light to medium exertional level. (R. 627-36; 1154-55). The ALJ also noted Dr. Lorenz's opinion that Jason had a permanent restriction of sedentary to light duty, maximum lifting of 12 pounds overhead, 21 pounds at waist level, maximum 5 hours a day, and maximum sitting and standing 45 minutes. *Id.* at 866, 1155. The ALJ specifically acknowledged that Dr. Koehn stated in his July 20, 2009 notes that Jason's fusion was a "failed fusion." *Id.* at 775, 1155. Considering all of the above, the record as a whole does not support Jason's suggestion that the ALJ ignored relevant evidence because she mistakenly believed Dr. Jilhewar's opinion to be uncontroverted as

to the period beginning July 14, 2009. The ALJ's minor mischaracterization of Dr. Jilhewar's opinion as uncontroverted regarding the period beginning July 14, 2009 is harmless as the ALJ reviewed evidence contradicting Dr. Jilhewar's opinion.

## C. Treating Surgeon's Opinion

Jason contends that the ALJ "played doctor" by giving "very minimal weight" rather than "controlling weight" to the opinion from Dr. Lorenz, his treating orthopedic surgeon. As to the nature, length, extent of the relationship and frequency of examination, Dr. Lorenz treated Jason from December 6, 2007 through January 4, 2010. (R. 852-942). Dr. Lorenz performed the three level fusion surgery on December 5, 2008 and saw Jason twelve additional times over the course of their relationship. *Id*. at 336-42, 854-67. Dr. Lorenz indicated that he based his findings on the FCA that was performed on June 11, 2009 by Alyssa Emanuelson (a KEY certified functional assessment specialist at Athletic & Therapeutic Institute Physical Therapy). (R. 866). According to the FCA, Jason was able to perform work at a light to medium exertional level. *Id*. at 627. The report noted that Jason was not capable of returning to his previous employment as a delivery truck driver, which is typically considered a heavy physical demand level position. *Id*.

According to the FCA, Jason was capable of lifting 19.2 pounds occasionally and 12.6 pounds frequently from chair to floor height. *Id*. Jason was also found to be able to sit and stand for 4 to 5 hours per day for 45 minute intervals, as well as walk for 2 to 3 hours, for a total workday of 5 to 6 hours. *Id*. at 629. Jason was able to bend/stoop, squat, crouch, and balance and occasionally climb stairs on a minimally occasional basis. *Id*. Jason was not able to kneel or crawl as he "demonstrated considerable difficulty getting into and out of position and was unable to perform the full activity." *Id*. at 627. Additionally, Jason was able to frequently use both feet, grasp with both hands and flex, and rotate his head and neck. *Id*. at 629. The report noted that

throughout the assessment, Jason had "numerous subjective pain reports/behaviors" and his "pain reports/behaviors became progressively worse during the FCA." *Id*. at 627. Based on the FCA, on July 13, 2009, Dr. Lorenz found that Jason was a maximum medical improvement from a surgical perspective and orthopedic perspective, resulting in a permanent restriction of "sedentary to light duty, maximum lifting of 12 pounds overhead, 21 pounds at the waist level. Maximum 5 hours a day, maximum sitting and standing 45 minutes." *Id*. at 866.

The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record."). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c).

The ALJ adequately explained why she did not give Dr. Lorenz's opinion "more than very minimal weight." (R. 1155). First, she correctly noted that Dr. Lorenz did not "explain why he reduced the claimant's capacity from what was found in the FCA." *Id*. The FCA found that Jason was capable of light to medium exertional work for 5 to 6 hours per day. *Id*. 627. However, Dr.

Lorenz opined that Jason would be able to perform sedentary to light exertional work for 5 hours a day. *Id*. at 866. Second, the ALJ noted that Dr. Lorenz "mistakenly stated that the FCA showed the claimant to be at the sedentary to light duty level when in fact it clearly states the claimant was at the light to medium level." *Id*. at 1155. The ALJ explained that she did not assign "more than very minimal weight" to Dr. Lorenz's opinion because he "misstates the findings of the evaluation upon which he basis his opinion and does not provide any explanation for his additional restriction" *Id*. In other words, Dr. Lorenz's opinion was inconsistent with the valid FCA upon which it was purportedly based and it was unclear to the ALJ how Dr. Lorenz arrived at his conclusions.[7] Because Dr. Lorenz did not explain his opinion and it was inconsistent with other substantial evidence, it was not erroneous for the ALJ to discount Dr. Lorenz's opinion and to rely on that of the ME. The ALJ also noted that Dr. Lorenz's treatment notes did not show any neurologic or musculoskeletal findings that supported the exertional limitations. *Id*. These reasons based on the supportability and consistency factors are sufficient reasons that are supported by the record. *See* 20 C.F.R. § 404.1527(c)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (ALJ may discount a treating physician's opinion if it is "internally inconsistent."); *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) ("The ALJ did not err here in determining that [the treating podiatrist's] opinion conflicted with the other medical evidence, including his own treatment notes."); *Latkowski v. Barnhart*, 93 Fed.Appx. 963, 969 (7th Cir. 2004) ("[T]he treating physician's opinion may be given less weight when it is not well-supported and is inconsistent with other evidence.). The ALJ was entitled to consider the above inconsistencies and weigh them in considering Dr. Lorenz's opinion.

---

[7] The ALJ also found that it was unclear why the June 2009 FCA indicated that Jason was able to perform a 5 to 6-hour workday, but it also reflected that Jason was able to sit for 4 to 5 hours, stand for 4 to 5 hours, and walk for 2 to 3 hours. (R. 629, 1154-55).

Jason further argues that the ALJ erred in failed to give Dr. Lorenz's opinion controlling weight based on the factors specified in 20 C.F.R. § 404.1527(c). The relevant inquiry is "whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an 'accurate and logical bridge' between the evidence and his conclusion." *Chris W. v. Berryhill*, 2018 WL 6305013, at *8 (N.D. Ill. Dec. 3, 2018) (*quoting Schreiber v. Colvin*, 519 Fed.Appx. 951, 959 (7th Cir. 2013) ("[W]hile the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clears that he was aware of and considered many of the factors, including Dr. Belford's treatment relationship with Schreiber, the consistency of her opinion with the record as a whole, and the supportability of her opinion."). The Court finds that the ALJ adequately considered the factors set forth in 20 C.F..R. § 404.1527(c)(2) and logically connected the evidence in the record to her determination of the weight given to Dr. Lorenz.

While the ALJ did not explicitly weigh every factor, she was aware of and considered the relevant factors. First, the ALJ expressly identified Dr. Lorenz as Jason's treating specialist. (R. 1155, 1161). Second, during the administrative hearing on March 25, 2015, Dr. Jilhewar testified about Jason's treating relationship with Dr. Lorenz, noted Dr. Lorenz's specialty as an orthopedic surgeon, and identified some of the tests documented in Dr. Lorenz's records, including an EMG, MRI, and an x-ray. *Id.* at 1188-91. The ALJ, therefore, was aware of and considered Dr. Lorenz's specialty, Jason's treatment history with Dr. Lorenz, and the tests he performed. As to the remaining factors (consistency and supportability), the ALJ correctly explained that: Dr. Lorenz misstated the finding of the FCA upon which he based his opinion; he failed to provide any explanation for his additional restriction of sedentary to light exertional work

for a maximum of five hours per day; and his restrictions were not supported by his own treatment notes which reflect no abnormal neurologic or musculoskeletal findings. *Id*. at 1155.

Moreover, the ALJ properly relied on Dr. Jilhewar's opinion that Jason could perform a range of sedentary work with certain restrictions during the period after July 13, 2009. The ALJ gave "great weight" to Dr. Jilhewar's opinion, explaining that Dr. Jilhewar had the opportunity to review the entire record. (R. 1160). Dr. Jilhewar noted that Jason's recovery from his December 5, 2008 three-level fusion surgery recovery was "uneventful" with fusion occurring by April 13, 2009. *Id*. at 1189. Dr. Jilhewar referred to the June 2009 FCA which found Jason capable of performing light to medium exertional work with various postural limitations. *Id*. Dr. Jilhewar rejected Dr. Lorenz's July 13, 2009 opinion of maximum of a five-hour workday based on the FCA because Dr. Lorenz did not explain whether the five-hour restriction applies to "all activities or only the functional activities." (R. 1190, 1191). In addition, Dr. Jilhewar noted that a pain management specialist (Dr. Koehn) prescribed Jason pain medications in more frequent doses than usual. (R. 1190). Dr. Jilhewar pointed out that Jason did not have any abnormal neurological findings. *Id*. Dr. Jilhewar noted that Dr. Koehn's treatment notes indicate a report of pain but no abnormality on examination. *Id*. Dr. Jilhewar also noted that Dr. Koehn documented that Jason reported no medication side effects. *Id*.

Dr. Jilhewar testified that Jason also had a medically determinable impairment of morbid obesity with a related diagnosis of obstructive sleep apnea. (R. 1191). According to Dr. Jilhewar, Jason reported to Dr. Koehn that he had excellent improvement in his sleep with use of a CPAP, but the sleep study was not in the record. *Id*. Dr. Jilhewar acknowledged Jason's reports of unresolved pain after July 13, 2009. *Id*. at 1194. However, Dr. Jilhewar found it significant that there was no documentation of any neurological deficit prior to surgery, an FCA dated March 21,

2008 found that Jason could perform light work, and there were few interventional therapies for pain after surgery except for pain medications and no follow-up appointments with Dr. Lorenz. *Id*. at 1194-95.

Dr. Jilhewar concluded from his review of Jason's records, that subsequent to July 13, 2009, Jason should be limited to sedentary work, sitting up to six hours in an eight-hour workday, and standing or walking up to two hours in an eight-hour workday, even though the June 11, 2009 FCA indicated Jason could perform light to medium work with certain occasional postural limitations. (R. at 1192). Due to Jason's chronic pain and extreme obesity, Dr. Jilhewar added that Jason can never climb ladders, ropes or scaffolds and can occasionally climb ramps and stairs, balance, stoop, and crouch. *Id*. 1192-93. Jason can never kneel or crawl because of his extreme obesity. *Id*. at 1193. Finally, Dr. Jilhewar found that Jason cannot work at unprotected heights, around large moving machinery, or be exposed to vibration. *Id*.

The ALJ credited Dr. Jilhewar's testimony and concluded that beginning July 14, 2009, Jason had the physical RFC to perform sedentary work with certain postural and environmental limitations. *Id*. at 1152. As the ALJ noted, Dr. Lorenz misstated the findings of the June 11, 2009 FCA he relied on and also failed to provide an explanation for restrictions that were greater than the restrictions in the FCA. *Id*. at 1155. The ALJ also accorded less weight to Dr. Lorenz's opinion because his treatment notes did not document any neurologic or musculoskeletal findings which would warrant his assessment that Jason can work a maximum of five hours in a workday. Because the ALJ articulated a logical and supported explanation for crediting Dr. Jilhewar's opinion over Dr. Lorenz's opinion, the ALJ did not err. *Fody v. Colvin*, 641 Fed.Appx. 568, 572 (7th Cir. 2016) ("ALJ adequately explained why she credited Dr. Jilhewar's opinion over [claimant's treating cardiologist's].").

Relatedly, Jason accuses the ALJ of impermissibly playing doctor "by drawing her own inference regarding the type of neurologic or musculoskeletal findings that would warrant" Dr. Lorenz's limitation that Jason is only capable of working a five-hour workday with sitting and standing no more than 45 minutes at time. Doc. 21 at 16. The Court disagrees.

ALJs "must not succumb to the temptation to play doctor and make their own independent findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). The Seventh Circuit has made clear that "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). Citing *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014), Jason contends that the ALJ is not qualified to "assess which neurologic or musculoskeletal findings would be required to support additional exertional limitation." (Doc. 21 at 16). In *Goins*, the ALJ erred by failing to submit an MRI to the "medical scrutiny" of an expert and instead played doctor when she "summarized the results of the 2010 MRI in barely intelligible medical mumbo jumbo." *Goins*, 764 F.3d at 680.

Unlike the ALJ in *Goins*, the ALJ here did not independently interpret medical records. The ALJ specifically relied on the opinion of Dr. Jilhewar, who opined that Jason could perform sedentary work with certain postural and environmental limitations. Dr. Jilhewar reviewed the medical record and stated that it showed not a "single documentation of neurological deficit in the medical record prior to surgery." (R. 1194); *see also* (R. 1190) (ALJ noting Jason had a work-related injury "without any focal neurological deficit."). The ALJ also noted that Dr. Jilhewar testified that the only finding by Dr. Koehn was pain in the absence of any abnormality on exam. *Id*. at 1153. As the ALJ referenced, upon examination by Dr. Koehn on October 26, 2009, Jason "was sitting and standing without apparent distress, had no antalgic positioning or guarding and was oriented and appropriate. He was tender in his lumbar region but not over his sciatic notches.

Motor and sensory examination was unremarkable. Straight leg raising was negative. Range of motion was only mildly provocative." *Id*. at 850, 1155-56. The ALJ cited additional records from Dr. Koehn from November 23, 2009, June 28, 2010, August 30, 2010, October 25, 2010, November 22, 2010, December 20, 2010, January 17, 2011, March 14, 2011, May 9, 2011, June 6, 2011, and August 1, 2011 in which Jason's physical examination remained unremarkable. *Id*. at 848, 1045, 1047, 1049, 1052, 1054, 1056, 1060 1058, 1062, 1064, 1156-57; *see also* (R. 1158, 1457) (St. Margaret's Community Health Clinic record dated 10/23/2013 noting no musculoskeletal or neurological problems). The ALJ accurately cited the medical record which substantially supports her finding regarding the absence of neurological and musculoskeletal findings. This does not amount to making an independent medical or an improper interpretation of the medical record.

**D.      Concentration, Persistence, and Pace**

Jason also objects that the ALJ did not adequately account for her moderate limitations in concentration, persistence or pace in the RFC finding and hypothetical question by limiting him to unskilled work of a simple, repetitive, and routine nature with occasional contact with the public, supervisors, and co-workers. The Commissioner argues that the ALJ did not simply limit Jason to simple, routine, or repetitive work but rather, provided a detailed mental RFC assessment that utilized alternative phrasing specifically excluding those tasks that someone with his limitations would be unable to perform. The Court agrees with Jason that the ALJ did not properly account for his limitations in concentration, persistence, or pace.

Here, the ALJ attempted to account for Jason's mental impairments by restricting the hypothetical to "unskilled works tasks by determination of 30 days or less, that would be of a simple, repetitive, routine nature" with "occasional contact with the general public of superficial,

incidental nature, as well [as] occasional interactions with supervisors and coworkers." (R. 1211-12). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). "This includes any deficiencies the claimant may have in concentration, persistence or pace." *Id.* Usually, an ALJ cannot account for moderate difficulties in concentration, persistence, and pace by limiting a claimant to simple, routine, repetitive tasks. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("In most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."); *see also Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008). While it is not necessary that the ALJ use the precise terms "concentration, persistence, and pace" in the hypothetical to the VE, the Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858-59; *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) ("Though particular words need not be incanted, we cannot look at the absence of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question.").

However, "an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) ("[I]n some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates

and translates those worksheet observations."). The issue then is whether the ALJ adequately accounted for Jason's concentration, persistence, or pace limitations despite the use of the disfavored terms in the hypothetical.

Here, the ALJ relied on a psychological medical expert's and the state agency consultants' assessments of Jason's mental RFC. On October 9, 2009, Dr. Linda Lanier, Ph.D., completed a psychiatric review technique diagnosing Jason with an affective disorder and an anxiety disorder. (R. 829, 831). Dr. Lanier opined that Jason was mildly limited in activities of daily living, moderately limited in maintain social functioning, and moderately limited in maintaining concentration, persistence or pace. *Id*. at 836. As to the specific tasks associated with concentration persistence, and pace and social interaction, Dr. Lanier found in Section I of the Mental RFC Assessment that Jason has moderate limitations in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. *Id*. at 840-41. 2In Section III, which asks the consultant to provide a narrative assessment of the claimant's mental functioning, Dr. Lanier explained further that despite Jason's moderate difficulties in maintaining concentration, persistence, or pace and social functioning, he can: understand, carry out, and remember moderately complex instructions; make simple work-related decision and judgments; relate appropriately to supervisors, coworkers, and work situations, but would work best in a lowered stress environment; and cope with changes in a routine work setting. *Id*. at 842.

On March 13, 2014, Dr. Joseph Mehr, Ph.D., reviewed the evidence in the file and concluded that Jason suffered from an affective disorder and anxiety-related disorder, with mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (R. 1272). Dr. Mehr also determined that Jason was "moderately limited" in four areas: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; and (4) the ability to interact appropriately with the general public. *Id*. at 1276-77. In the narrative section of the Mental RFC, Dr. Mehr concluded:

> This 38 year old man has dysthymic mood and social anxiety but is oriented times 3, he does not have significant memory impairment, and he is essentially independent in normal activities of daily living. He retains the mental ability to remember general work procedures, and to understand and remember instructions for simple tasks of a routine and repetitive type. This gentleman has attention and concentration necessary to persevere and complete those operations for the time periods usually expected in the work force, of two hours. He retains the capacity to maintain a schedule and be on time. He would need only commonly provided supervision. He has the endurance and pace necessary to fulfill a normal workday in a regular work week on a consistent basis. He has the capacity to perform at a consistent acceptable rate, and would require only common numbers and lengths of rest breaks. Psychologically based symptoms would not significantly impair his capacity to consistently complete a normal work week. He has limited social tolerance due to his anxiety but he can relate appropriately in socially undemanding settings that have low stress demands and require only brief superficial interactions and with reduced interpersonal contact away from the general public. This fellow retains the capacity to adapt to simple changes in daily routines, and the capacity to be aware and self-protective of common hazards. He retains the capacity to utilize public transportation to and from a place of work.

*Id*. at 1277-78. Dr. Leslie Fyans, Ph.D., affirmed Dr. Mehr's findings on November 26, 2014, noting that "the subjectively derived gaf score underestimates the client's functional adaptability." *Id*. at 1294-95, 1298-1300.[8]

---

[8]      On June 7, 2010, Dr. Gregory Hawley, M.D., assigned Jason a GAF score of 35  A GAF score of 31-40 indicates "some impairment in reality testing or communication or major impairment in several areas,

Dr. Michael Cremerius, a psychological expert, testified at the hearing held on March 25, 2015. (R. 1185-87). Dr. Cremerius reviewed the record and had the opportunity to hear Jason's testimony. (R. 1185-87). Dr. Cremerius testified that Jason's "mental impairments were generally non-severe." *Id.* at 1186. However, he generally concurred with Dr. Lanier's diagnoses of depressive disorder and anxiety disorder and findings of moderate limitations in social functioning and concentration, persistence, and pace. *Id.* He stated that Jason is "depressed over his pain and functional restrictions . . . reportedly from the accident." *Id.* Dr. Cremerius concluded that Jason could understand and remember simple and detailed but not complex instruction. *Id.* at 1186-87. Jason could perform simple and routine tasks. *Id.* at 1187. His social difficulties would permit only incidental contact with the public and occasional contact with coworkers. *Id.*

The ALJ gave "great weight" to the opinion of Dr. Cremerius. (R. 1151). Without resolving the inconsistencies between Dr. Lanier's opinion and the later state agency consultants' evaluations, the ALJ also gave "considerable weight" to all the state agency consultants' opinions but found a "greater degree of limitation in social functioning on the residual functional capacity to reflect irritability resulting from perceived pain." *Id.* at 1157. At step three of the five step sequential evaluation process, the ALJ found that beginning July 14, 2009, Jason had moderate difficulties in social functioning and concentration, persistence or pace. (R. 1151). The ALJ's mental RFC restricted Jason to performing "unskilled work tasks learned by demonstration or in 30 days or less of a simple, repetitive and routine nature" with "occasional, superficial and incidental contact with the general public and occasional interaction with supervisors and

such as work, family relations, or judgment." *Thomas v. Berryhill*, 2017 WL 3521413, at *2 n.1 (N.D. Ill. Aug. 15, 2017). "The GAF, which assesses an 'individual's overall level of functioning,' no longer is widely used by psychiatrists and psychologists." *Winsted v. Berryhill*, 923 F.3d 472, 474 n. 1 (7th Cir. 2019). The ALJ gave "no weight" to the GAF score, finding that it "is a snapshot of self-reported functioning on one day and does not reflect the improvement seen thereafter." (R. 1158). Jason does not challenge this aspect of the ALJ's decision.

coworkers." (R. 1152). The ALJ included these limitation in the hypothetical questions posed to the VE. (R. 1211-12)

While the ALJ was entitled to rely on Dr. Cremerius's opinion and the narrative explanations offered by the state agency psychologists, the ALJ "still must adequately account for limitations identified elsewhere in the record, including specific questions raised in the check-box sections of standardized forms such as the PRT and MRFC forms." *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019). In *DeCamp*, the ALJ gave "some weight" to the mental limitations identified by three state agency psychologists whose opinions supported moderate restrictions in concentration, persistence, or pace and mild restrictions in understanding, remembering, and carrying out simple instructions. *Id*. at 674. The ALJ's RFC limited the claimant to "unskilled work with an SVP of 2 or less, with no fast-paced production line or tandem tasks, at a job that allows her to be off task up to 10% of the workday." *Id*. at 675. The Commissioner argued that the ALJ adequately accounted for DeCamp's limitations in her RFC determination and in the hypothetical question to the VE "by relying in part on the narrative explanations (the part of the PRT and MRFC forms where the doctors provide a written explanation of their findings, rather than the check-box sections) offered by" two of the state agency psychologists. *Id*. at 676. The Seventh Circuit held that the ALJ did not properly evaluate DeCamp's limitations in concentration, persistence, and pace by failing to account for limitations identified in the check-box sections of the PRT and MRFC forms. *Id*. The Court explained that ALJ "focused her analysis on the doctors' bottom-line conclusion that DeCamp was not precluded from working without giving the vocational expert any basis to evaluate *all* DeCamp's impairments, including those in concentration, persistence and pace." *Id*.; *see also Yurt*, 758 F.3d at 858-59 (reversing and remanding where the ALJ relied on the state agency psychologist's narrative explanation which

translated the limitations identified by the doctor in the check-box section of the mental RFC form because the ALJ did not mention the six areas in the check-box section of the form where the psychologist found moderate limitations).

Similarly here, the ALJ failed to adequately account for limitations identified by the state agency psychologists elsewhere in the MRFC assessments. Specifically, the ALJ's hypothetical to the vocational expert failed to include Jason's moderate limitation in "maintain[ing] attention and concentration for extended periods" identified by all three state agency consultants. (R. 840, 1276, 1298). Nor did the hypothetical account for Dr. Lanier's additional finding that Jason is moderately limited in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. at 841. The ALJ's heavy reliance on Dr. Cremerius's testimony is similarly problematic because he "concur[red]" with Dr. Lanier's assessment and found that Jason had moderate limitations in concentration, persistence, and pace, yet did not incorporate those limitations in his recommended mental RFC. *Hoagland v. Colvin*, 2014 WL 4652348, at *8 (N.D. Ill. Sept. 18, 2014) (holding ALJ erred in relying on ME's mental RFC recommendation where ME found claimant had moderate difficulties in concentration, persistence, and pace, but "[w]ithout explaining why, she made not mention of limiting [claimant] to jobs with simple instructions not requiring intense focus or concentration for extended periods of time, or other similar restrictions used to accommodate difficulties with concentration, persistence, or pace.").

"Additionally, where a claimant's limitations are stress-related, . . . the hypothetical question should account for the level of stress a claimant can handle." *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019); *Yurt*, 758 F.3d at 858 (ALJ's "hypothetical did not limit him to low

stress positions" despite the state agency psychologist's "having specifically mentioned in his narrative RFC that [claimant] could deal with an environment 'where stress levels are limited.'"). In this case, all three state agency psychologists indicated that Jason should be limited to low stress work, but the ALJ did not include a restriction related to the stress in the RFC or hypothetical question. (R. 842) (Dr. Lanier stating Jason "would work best in a lowered stress environment."); (R. 1277, 1299) (Drs. Mehr and Fyans stating that Jason "can relate appropriately in socially undemanding settings that have loss stress demands."). The ALJ's failure to account for the level of stress Jason can handle is another error in her analysis of his mental health impairments.

Finally, there is no evidence here that the VE reviewed Jason's medical records or heard testimony about the specific limitations that were omitted from the ALJ's hypotheticals, which could have excused the ALJ from stating all of Jason's limitations. *DeCamp*, 916 F.3d at 676; *Yurt*, 758 F.3d at 857. Accordingly, the Court concludes that the ALJ's failure to incorporate the limitations in concentration, persistence, or pace identified by Dr. Cremerius and the state agency psychologists, whose opinions the ALJ credited, into her mental RFC determination and in the hypothetical question to the VE requires remand for further proceedings. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (where hypothetical failed to address claimant's documented limitations in concentration, persistence, and pace "the vocational expert's assessment of the jobs available to [claimant] is called into doubt, as is the ALJ's conclusion that [claimant] is not disabled under the Social Security Act."). On remand, the ALJ shall pose a hypothetical question to a VE that explicitly accounts for Jason's documented limitations of concentration, persistence, and pace as well as the level of stress Jason can handle.

## E.    Sitting and Standing Limitation

In his final challenge to the ALJ's decision, Jason focuses on whether the ALJ was required to incorporate into her hypothetical the 45-minute sitting and standing limitations identified in the

June 11, 2009 FCA. (R. 629). "If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). However, "the ALJ is required only to incorporate into [her] hypotheticals those impairments and limitations that [she] accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2009).

The ALJ determined that Jason could "sit, stand or walk within the normal break parameters required in sedentary level exertion." (R. at 1155). The hypothetical posed to the VE included all of the limitations included in the RFC. *Id.* 1152, 1211-12. The ALJ built the requisite logical bridge from the evidence to her conclusion that the RFC and hypothetical need not include a 45-minute sitting and standing limitation. The ALJ explained that she was "mindful of the 45-minute duration periods set forth in the assessment but [found] no objective basis or support for this requirement." *Id.* at 1155. For example, the ALJ's decision noted that Jason's straight leg test was negative, he had no motor or sensory deficit, his musculoskeletal and neurological findings were normal, and the only finding was the report of pain in the absence of abnormality on examination. (R. 1151, 1153, 1158). Jason has not shown that the ALJ erred in finding that the June 2009 FCA's 45 minutes at time sitting and standing limitations were unsupported by objective evidence. Under these circumstances, the ALJ's explanation was adequate and she did not error in failing to credit the FCA's sitting and standing limitations because they were inconsistent with the overall objective medical evidence.

## CONCLUSION

For the reasons and to the extent stated above, Plaintiff's Motion for Summary Judgment [20] is granted in part and denied in part. The decision of the Commissioner is

reversed, and the case is remanded for further expedited proceedings consistent with this Opinion.

**SO ORDERED.**

Dated:  October 8, 2019

_____
Sunil R. Harjani
United States Magistrate Judge